Petition of Edward Vieth SITTLER to be admitted to become a citizen of the United States of America.

United States District Court
S. D. New York.
Aug. 24, 1961.

David Ilchert, U. S. Naturalization Examiner, Long Island City, N. Y., for U. S.

William Stringfellow, and James M. Montgomery, New York City, for petitioner.

MacMAHON, District Judge.

The Naturalization Examiner opposes this petition for naturalization on the ground that petitioner, Edward Vieth Sittler, has failed to establish that during the five-year period immediately preceding the filing of his petition, he has been, and still is, attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States, as required by Section 316(a) of the Immigration and Nationality Act, 8 U.S C.A. § 1427.

Petitioner has complied with all the formal requirements of the law, and his reputation and general conduct have been shown to be good. He avows his attachment to the principles of the Constitution and to the good order and happiness of the United States. He produced, at various times, twenty witnesses from among his neighbors, colleagues, pupils, relatives, friends, and an attorney from the Department of Justice, all of whom testified to the effect that he was truthful, law-abiding, attached to the principles of the Constitution, a devoted husband and father, a dedicated teacher, and a man of good habits. None had ever heard him say anything against the United States. All held him in high esteem and recommended him for citizenship. Indeed, many testified that, in their opinion, he would make a better than average citizen.

Against this array, the government relies primarily upon a history of petitioner's conduct, convictions and attitudes during the second world war which, it claims, cast such deep doubt upon the sincerity of his avowed attachment to the principles of the Constitution as to require denial of this petition. Aside from petitioner's own testimony, the only evidence the government produced respecting petitioner's attitude toward the principles of the Constitution during the five years preceding the filing of the petition was the testimony of a newspaper reporter that in the course of a four-hour interview petitioner had said that he could not condemn Hitler. The testimony of two other witnesses and the affidavit of a third stated in substance that at various times in 1948 petitioner had made anti-American, anti-Semitic and pro-German remarks.

■ The court neither saw nor heard any of the government witnesses. The Naturalization Examiner did, and his appraisal of the credibility of their testimony should not be rejected unless there is good cause for doing so. I find no such cause here, but the content of the testimony of the four government witnesses respecting the post-war period is too fragmentary, indefinite and remote to stand alone as a sufficient basis for denying the petition.

■ Attachment to the principles of the Constitution means merely an acceptance of the fundamental political habits and attitudes which prevail in the United States and a willingness to obey the laws which may result from them. The object of the statutory requirement is to admit as citizens only those who are in general accord with the basic principles of the community. Yin-Shing Woo v. United States, 2 Cir., 1961, 288 F.2d 434. Thus, the statute requires a willingness on the part of the alien to throw in his lot with our society and make its fate his own. United States v. Rossler, 2 Cir., 1944, 144 F.2d 463, 465.

The court must, therefore, ascertain whether Sittler's oath to support and defend the Constitution and laws of the United States and to bear true faith and allegiance will be taken without mental reservation or inconsistent purpose, whether his views are compatible with the principles of the Constitution as well as with the duties of American citizenship, whether he is above suspicion of a preference for a hostile form of government, whether he is willing to support the government in time of war as well as in time of peace, and whether he will be loyal to our country or give aid and comfort to her enemies. United States v. Macintosh, 1930, 283 U.S. 605, 606, 51 S.Ct. 570, 75 L.Ed. 1302.

■ Accordingly, the fundamental question before the court is whether the petitioner is sincere in declaring his attachment to the principles of the Constitution and his favorable disposition to the good order and happiness of the United States. This requires ascertainment of his state of mind, Allan v. United States, 9 Cir., 1940, 115 F.2d 804, and that can be fathomed only by the credibility of what he says and the reflection of his inner views by his outward conduct. Petitioner's credibility on the witness stand is, therefore, of vital significance. His behavior and reputation in the community are also significant to the

extent that they tend to establish or negative his belief in the principles of the Constitution.

In inquiring into the mind and conscience of petitioner, proof of good behavior during the critical five-year period does not close the inquiry. The court may also consider the petitioner's conduct and acts at any time prior to that period. Evidence of past conduct and attitudes at any time prior to the five-year period is material insofar as it throws light, or casts shadows, upon the petitioner's attitude during the probation period. 8 U.S.C.A. § 1427(e); Posusta v. United States, 2 Cir., 1961, 285 F.2d 533, 535. We must, therefore, probe this petitioner's background and ascertain whether it reveals his acceptance or rejection of the fundamental political habits and attitudes which prevail in the United States.

The petitioner, Edward Vieth Sittler, was born in Ohio in May 1916. He was raised and educated in the United States for twenty-one years, when, in September 1937, after two years of college and an unsuccessful marriage, he went to Germany. His expressed reasons for doing so were to study the language, music, philosophy, history and culture of the country from which all of his grandparents had come, and to see what was going on in Germany and in Europe. During the years 1937 to 1940, he attended the University of Cologne, the University of Tuebingen, and the University of Berlin, and also worked as a translator and teacher.

Sittler applied for German citizenship on September 4 or 5, 1939, immediately after the outbreak of the second world war, and was naturalized six months later, in the spring of 1940. He met his wife in September 1939, after he had applied for German citizenship, and married her a year later on September 27, 1940. She held dual British and German citizenship.

Sittler denied any knowledge or recollection of taking an oath of allegiance to Germany, but admitted that he voluntarily renounced his United States citizenship. He testified that, at the time, he had only a superficial familiarity with the form of government existing in Germany, but admitted that he knew the Nazi program and that Hitler and the Nazi Party ruled the country. He explained that, as he saw it, "this country and people, Germany, was up against the crucial test and moment of its national existence. It seemed imminent that France, Britain, Poland, perhaps Czechoslovakia and even Russia would take some action against Germany because of its efforts to unite its territories, also to expand its territories, and if they did so concertedly there wouldn't be any Germany." He elaborated at another point that he "seriously thought then, in 1939, when the dispute ranged around the Polish Corridor * * * that if the various countries of Europe, who were, as I saw it, blind to this communist threat, were all to descend upon Germany * * * there wouldn't be any Germany left. * * * I never imagined that everybody in Germany was perfect and humane and much better than anywhere else. I regarded it as a frontier to which I was going, to venture my abilities and such strength as I had in defense of a bastion or outpost—threatened outpost—of our civilization. * * * I think that that was the situation in 1939, as I saw it then and as I tried to tell you about it now, in 1960. And I think of the identical geographic situation—I find by an ironic biologic jest, that my own son—as you know, he is a German citizen—and he is in the American Army—and he is stationed in Germany because there are Soviet armies a couple of hundred miles away. * * * I said—I am renouncing my American citizenship in order to do what is absolutely essential for the preservation of [Germany] because it is essential to the preservation of the United States."

Sittler was also "interested in Germany in a sentimental or ancestral sense", "intended to marry a German girl", "wanted to see that Germany got a square deal", and "the attention which

I thought it deserved, not because my grandparents came from there but because of my descent from this people. I studied. I now knew their language. I knew something of their culture, of their feelings and their virtues, and this was a crisis. I felt they needed a helping hand * * * and I was prepared to accept a considerable sacrifice to offer one."

Although he voluntarily renounced his native citizenship in the United States, he testified: "At the time I left the United States I have never looked upon my leaving the country or upon my taking out citizenship in another country which later became at war—became hostile to the United States—I never understood that myself as becoming opposed to the Constitution of the United States or becoming opposed to the welfare, future welfare of the United States."

In April of 1940, while awaiting his certificate of citizenship, Sittler obtained work with the Information Office of the German government and later was transferred to the German Radio Service as a translator rendering newscasts into colloquial English.

He was naturalized as a German citizen in the spring of 1940, and shortly thereafter drafted into the German army, but after receiving basic training was reassigned to Radio Service. Sometime in 1941 or 1942, he was transferred, at his request, to the U. S. A. Zone of the German short wave radio. In the fall of 1942, he voluntarily joined the Nazi Party because he felt obliged as a citizen to take part in the party which he believed would either save Germany or lead it to ruin. He favored the dictatorship Hitler had established and believed it was proper to suspend elections.

Sittler continued working at the German short wave radio until the end of the war, in April 1945. An American citizen named Best was in charge of the station, and at various times during that period Sittler worked with three other citizens of the United States—Burgman, Chandler and Monty. He collaborated with Burgman in making twenty-five recordings of propaganda for broadcast to the United States. He volunteered helpful ideas, material, comments and criticisms for the improvement of Chandler's propaganda broadcast, although he was fully aware that Chandler had been indicted by the United States for treason. He also participated in the broadcast of a panel discussion with Monty.

In 1943 Sittler heard rumors from a fellow employee named Wagner, who had visited the eastern front, that Nazi Germany had established concentration camps where Jews and other refugees were being exterminated, but he refused to believe them as anything more than atrocity stories.

Sometime in 1943, upon his request, Sittler became a commentator. Announcing himself as "Dr. Vieth, your Nazi commentator," he prepared and delivered his own propaganda broadcast in a folksy-midwestern manner three or four times a week to the United States and other English speaking countries until the last hours of the war. He also broadcast condensations of "editorials" written by Dr. Goebbels.

The propaganda in which Sittler participated vilified our then President as a lying warmonger, urged his impeachment as a traitor, maligned the Jews as profiteering instigators of the war, castigated our allies, ridiculed our involvement in a European war, instilled fear, solicited mothers to petition the recall of their boys, incited inflation, sowed racial strife, implanted atrocity stories, fabricated military reversals, predicted our defeat, occupation and partition, and counseled surrender.

Sittler admitted that he knew that the program was aimed at undermining the morale of the American people and discouraging our war effort. He wanted to demonstrate through his personal participation that there were Americans who were sympathetic to Germany.

Nevertheless, Sittler felt that the propaganda was ineffective. At the risk of his job, he bypassed his immediate supe-

riors and voluntarily wrote a memorandum to the Minister of Propaganda suggesting that all German propaganda to foreign countries be National Socialist propaganda in its most representative sense. He quibbled about the accuracy of a translation of the memorandum but conceded that he criticized the whole program on the ground that it was ineffective and offered suggestions for its improvement.

In the final hours of the war, in April 1945, Sittler was given a uniform of the S. S. Elite Guard and travel orders which permitted him to leave Berlin. About three months later, after serving as an interpreter for the British, he surrendered to the American military authorities. He was ultimately confined at Oberuasel, Germany where he was interviewed in the spring of 1946 by Victor C. Woerheide, an attorney handling treason cases for the Internal Security Division of the Department of Justice. Woerheide spent many hours with Sittler and made a thorough investigation of his involvement with Nazi Germany. He testified before the Naturalization Examiner that Sittler is attached to the principles of the Constitution and would make a good citizen.

According to Sittler, after his release from Oberuasel, he was offered the opportunity of regaining his United States citizenship if he would accept employment with the United States Central Intelligence Agency (C. I. A.). He rejected the offer, despite the inducement, because he was constitutionally opposed to intelligence work. He did, however, cooperate with the Department of Justice and entered the United States as a temporary alien to testify for the government at the treason trials of his former colleagues—Best, Burgman and Chandler—who were all convicted. He also testified before a grand jury against Monty, who pleaded guilty to an indictment for treason.

The treason trials extended over a long period, and Sittler was allowed to seek employment and further his education in the United States. He was a student and an instructor at Northwestern University for two years and received his Ph. D. in 1950. He then left the United States for a short period because his permission to stay expired, but was lawfully readmitted for permanent residence in 1950. Since then, he has held a series of teaching assignments in American colleges, as well as other positions. A storm of controversy erupted around Sittler over his Nazi background, and as a result he was rapidly dismissed from one position after another, including his last one at C. W. Post College. He has been unemployed for a long time.

He is still married to his second wife and has eight children ranging in ages from seven to nineteen years, four of whom were born in Germany and four in the United States. At the time of the hearing, his wife resided in the United States. All of his children, however, were living in Germany, and his oldest son is serving there in the United States Army. He testified that his financial plight necessitated sending his family to live with a friend in Germany while his status was being resolved.

Asked on the stand by his counsel why he now petitioned for citizenship, Sittler replied: "Once the outer conditions which led me to adopt German citizenship in the first place had radically changed, I tried to adapt myself and my family to these new circumstances and to restore the balance." He explained that he had ties in both countries, that his children were raised here, and that in order to go on teaching, he wanted to adapt the outward form of his citizenship to the realities of his life.

Sittler now professes his attachment to the principles of the Constitution and his favorable disposition to the good order and happiness of the United States. He swears that his oath of allegiance would be as absolute as laws and pledges can make it.

He now attributes his adoption of the cause of Nazi Germany to political immaturity and lack of knowledge of what Hitler really was in 1937 and 1939. He

says he was oblivious to the significance of events which were happening in Germany during the two years he lived there before becoming a citizen. He now rejects anti-Semitism and condemns Hitler as a monster. He claims his renunciation of American citizenship was due to an imperfect understanding of our history and democratic form of government. He testified before the court that: " * * * a situation in my own life arose where I as an American, which is not capable of a facile definition, decided that for reasons that were convincing to me, which I thought were for the welfare of the United States, Germany, of the larger community, western community, that it was my obligation to do what I did in Germany and to let people know what I was doing, and to justify, assume the responsibilities of so doing, both for Germany and for the United States. That is what I tried to do, but this did not efface general realities in my life, my birth, my patriotic—my understanding of America, my attachment, or what it has meant to me as a person, as a teacher."

The biographical facts are not in substantial dispute. Indeed, most of them come from Sittler's own lips. The sorry chronicle shows beyond all doubt that before and during the second world war Sittler became infected with an ideology and dedicated to a form of government diametrically opposed to the principles of our Constitution and bent on the destruction of our country. Eager to prove his loyalty to his Nazi idols, he voluntarily turned his knowledge of our country, our language, and our people into a weapon against us in the bloodiest war in all history. His hostility to the good order and happiness of the United States and zeal for the malevolent mission of Nazi Germany has been overwhelmingly established. There could be no greater infidelity to the principles of the Constitution than the defection of this native son to the totalitarian ideology of Nazi Germany. Nor, short of treason, could there be deeper enmity to the good order and happiness of the

United States than to wage war upon her on the side of the enemy.

However strong the inference from his prior hostile attitude that Sittler still opposes the principles of the Constitution, the crucial question here is whether he is now sincere in declaring his attachment to them. Krausse v. United States, 2 Cir., 1952, 194 F.2d 440, 442.

The court saw and heard Sittler. We have also given thorough study to his entire testimony on the hearings before the Naturalization Examiner. His testimony demands searching scrutiny for his indelible past has left permanent scars on his character which bear heavily upon his credibility.

Sittler testified that his motivation for applying for German citizenship was his zeal to join Germany in its fight against communism in the defense of western civilization. He equates his situation in September 1939 to that of his son now serving with the American Army in Germany. The court takes judicial notice, however, that the Europe of today is not that of September 1939. Sittler conveniently overlooks the fact that on August 24, 1939, almost two weeks before he applied for German citizenship, Hitler and Stalin signed their infamous non-aggression pact paving the way for World War II. He also ignores the fact that Germany attacked not communist Russia, but democratic Poland, on September 1, a few days before he threw in his lot with Nazi Germany. His sworn reason for seeking German citizenship is thus an updated pretext designed to mislead the court.

Time and again, Sittler first gave false answers to pertinent questions by the Naturalization Examiner and admitted the truth only after he was confronted with immutable evidence. Thus, he categorically denied that he had announced himself as "Dr. Vieth, your Nazi commentator," and said he would be surprised to learn that he had. Confronted with documentary evidence, he admitted that he had, and then gave an elaborate explanation of how it came about in a

feeble effort to escape the consequences of another answer where he denied ever using part of his family name in any of his Nazi broadcasts.

Again, in response to a question as to the nature of his work in 1942, he replied that he was a translator on the short wave radio but did no other work at that time. On further questioning, he admitted that he participated in the broadcast of a musical program but claimed that he did nothing else. A recorded transcript of a broadcast, however, proved not only that he sang "Carry Me Back to Old Virginny," but also that he spoke in a propaganda dialogue.

He denied taking an oath of allegiance to Germany, but, on the Burgman trial, he testified that he "certainly did". Confronted with his inconsistent testimony, he first explained that he lost his grip on the Burgman trial because the Judge was unfair to him, and then claimed that he had misunderstood the question. He now claims that he joined the Nazi Party because he felt an obligation as a citizen to participate in politics, but, on the Burgman trial, he first testified that coercion, force and duress compelled him to join, and then retreated under cross-examination to fear of eviction from his apartment.

He first claimed that his transfer to the U. S. A. Zone of the German Radio had been ordered by his superiors, but when confronted with documentary evidence admitted that he had voluntarily requested the transfer and laid his earlier denial to poor memory.

Asked whether he had aided Chandler in the preparation of manuscripts for broadcasting, he answered no, but went on to explain that he had exchanged ideas and criticized his program. He did not admit giving material to Chandler until confronted with a document.

It would unduly prolong this opinion to detail other similar instances, but one remaining subject deserves mention. Sittler claims that he was a mislead youth only superficially familiar with Nazi Germany when he applied for citizenship. But he was not a child when he went to Germany in September 1937. He was twenty-one years old and had completed two years of college in the United States. He was twenty-three when he applied for German citizenship after living there two years. Millions of American men his own age were mature enough soon to risk and give their lives for the principles he rejected.

Long before Sittler left America in September 1937, the totalitarian and militaristic character of the Nazi regime were certainly familiar to any American college student. In 1925, "Mein Kampf" had laid bare Hitler's anti-democratic ideology and his plot for the expansion of Germany at the expense of her neighbors. Within a year after Hitler became Chancellor in 1933, flaming headlines decried the Nazi overthrow of the Weimar republic, destruction of opposing political parties, denunciation of democracy, inauguration of personal dictatorship, regimentation of culture, book burning, persecution of Christians and Jews, exaltation of the master race, use of terrorism, idolatry of the Fuehrer, abolition of freedom of speech, press and assembly, suppression of labor unions, withdrawal from the League of Nations, repudiation of the Treaty of Versailles, rearmament, conscription, military aggression, and occupation of the Rhineland. The Nazi excesses provoked worldwide revulsion. It is simply incredible that all the outcry of a shocked world escaped the notice of a college student so absorbed with Germany that he was eager to go there to perfect his knowledge of the language, music, and culture of the people. Nor is it conceivable that while he lived there for two years the Austrian Anschluss, the Munich crises, the conquest of Czechoslovakia, the constant threat of aggression, and the outbreak of the second world war on September 1, 1939 failed to make a significant impression on a twenty-three year old man. These world-staggering events strip the last vestige of credibility from Sittler's testimony that he had only a superficial knowledge of the kind of gov-

ernment ruling Germany on September 4 or 5, 1939, when he applied for citizenship. Furthermore, he admits his knowledge of the Nazi program. He concedes his sympathy with its cause. His zeal also undermines any claim of ignorance. Surely one could not become so quickly and so fanatically dedicated to a government about which he knew as little as Sittler now pretends.

■ The instances noted are merely illustrative of the unreliability of Sittler's testimony. His testimony is so replete with distortions, half-truths, incomplete answers, misleading responses, evasion, concealment, hedging, suppression, equivocation, and endless quibbling that the court can give it no credence whatever. Surely the government is entitled to the truth, the whole truth and nothing but the truth, when a supplicant for citizenship takes the witness stand in support of his application. Good citizenship demands the highest standards of probity. Truthful answers by the applicant to pertinent questions on a naturalization proceeding lie at the threshold of the requirements for citizenship. Anything less cannot be tolerated.

"Acquisition of American citizenship is a solemn affair. Full and truthful response to all relevant questions required by the naturalization procedure is, of course, to be exacted, and temporizing with the truth must be vigorously discouraged. Failure to give frank, honest, and unequivocal answers to the court when one seeks naturalization is a serious matter. Complete replies are essential so that the qualifications of the applicant or his lack of them may be ascertained. Suppressed or concealed facts, if known, might in and of themselves justify denial of citizenship. Or disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship." Chaunt v. United States, 1960, 364 U.S. 350, 352–353, 81 S.Ct. 147, 149, 5 L.Ed.2d 120.

■ Sittler's lack of candor and probity is a sufficient flaw in his moral character to warrant a denial of this petition. It also destroys the credibility of his avowed attachment. The inference that Sittler has a preference for a hostile form of government is deepened by Sittler's testimony that he always remained attached to the principles of the Constitution despite his allegiance to Nazi Germany. It is self-evident that Nazi ideology is so totally incompatible with the principles of the Constitution that fidelity to both cannot abide in one man at the same time. The mere suggestion of such conflicting allegiance shows Sittler's lack of understanding of the principles of the Constitution. The record is also remarkably lacking in affirmative evidence of attachment. Sittler, who was always so eager to demonstrate his loyalty to the Nazis, turned down his opportunity to make amends to the United States by serving the C. I. A.

The conclusion is inescapable from all of the evidence that Sittler's application for citizenship is motivated, not by bonds of affection for the United States and attachment to the principles of the Constitution, but by the opportunistic demands of self-interest. He concedes as much in his testimony that once the conditions which led him to renounce citizenship in the United States and acquire citizenship in Nazi Germany had radically changed, he wanted to become an American citizen in order to go on teaching and raise his children here. His demeanor on the stand when expounding on his attachment to our way of life was one of icy detachment. He was like a man observing an ant hill, academically curious and interested, but out of touch, remote, and without thought of sharing the fate of the objects of his study. The overall impression was that if conditions had not "radically changed" he would still be "Dr. Vieth, your Nazi commentator".

■■ The statutes prescribing qualifications for admission to citizenship are to be construed with definite purpose to favor and support the government. To safeguard against admission of those who are unworthy, or who, for

any reason, fail to measure up to required standards, the law puts the burden upon every applicant to show by satisfactory evidence that he has the specified qualifications, and gives the government the benefit of any doubt. United States v. Schwimmer, 1929, 279 U.S. 644, 649, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Manzi, 1928, 276 U.S. 463, 467, 48 S.Ct. 328, 72 L.Ed. 654. This petitioner has wholly failed to sustain his burden of proof.

American citizenship is a precious privilege. In this troubled world, it is sought by many, granted to few, and treasured by all who possess it. The gift is not too be conferred lightly, and certainly not to those as unworthy as this petitioner. The petition is, therefore, denied. So ordered.