Edward Vieth **SITTLER**, Petitioner-Appellant,

v.

**UNITED STATES of America,** Respondent-Appellee.

No. 181, Docket 27289.

United States Court of Appeals
Second Circuit.

Argued Jan. 10, 1963.
Decided April 12, 1963.

Clark, Circuit Judge, dissented.

Edward Q. Carr, Jr., of The Legal Aid Society, New York City, for petitioner-appellant.

Roy Babitt, Special Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Patricia A. Garfinkel, Asst. U. S. Atty., New York City, on the brief), for respondent-appellee.

Before CLARK, KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

This is an appeal from an order of the district court (197 F.Supp. 278) denying appellant's petition for naturalization on the ground that petitioner failed to establish that he was "attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States." We affirm the action of the district court.

The statute which governs the present proceeding is Section 1427 of Title 8 of the United States Code which provides, in relevant part:

"(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

\*     \*     \*     \*     \*     \*

"(e) In determining whether the petitioner has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a

basis for such determination the petitioner's conduct and acts at any time prior to that period."

■ Under this provision the petitioner has the burden of showing that he meets the statutory qualifications. Taylor v. United States, 231 F.2d 856 (5th Cir., 1956); Tutun v. United States, 270 U.S. 568, 578, 46 S.Ct. 425, 70 L.Ed. 738 (1926).

The record shows that the petitioner here, Edward Sittler, was born in Delaware, Ohio, in 1916. His family was of German descent although German was not spoken in his home and he did not learn to speak German until he went to Germany at the age of 21.

Sittler was graduated from high school in Ohio and attended Ohio State University and Bard College for three years. In 1937 Sittler went to Germany where, after spending some time learning the language, he became a student at one of the German universities. In 1939, while still studying at a German university Sittler applied for naturalization as a citizen of Germany. It may be considered of some significance that Sittler's application for naturalization was filed a few days after Hitler's attack on Poland, which was the beginning of World War II. His application for German citizenship was granted in the spring of 1940. From the spring of 1940 until the final defeat of Germany in 1945 Sittler was employed in the Information Office of the German government.

During the period 1943 to 1945 he was a commentator broadcasting propaganda in English on a radio program directed to the United States.

Late in 1942 or early in 1943 Sittler joined the Nazi party.

■ In determining whether the petitioner had sustained his burden of establishing the qualifications enumerated in Section 1427, the district court took into consideration the petitioner's conduct and acts during the period 1937–

1945 as it was expressly authorized to do by that statute. The district court held that the petitioner "wholly failed to sustain his burden of proof." We must affirm unless we find that the determination of the district court was clearly erroneous, and in our consideration of that question we must accord due weight to the opportunity of the district judge to observe the conduct and demeanor of the witnesses, particularly the petitioner himself.[1]

■ On the basis of a careful review of the entire record we cannot find that clear error which we are obliged to find if we are to set aside the district court's order. The district court could properly conclude from the evidence that Sittler had shown himself to be attached at one time (a time during which the United States was at war with Germany) to the principles of Nazism as those principles were exemplified by the government of Adolf Hitler. It is hardly arguable, though petitioner attempted to argue it, that one who is attached to the principles of Nazism can at the same time be attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. Therefore one who now claims to be attached to the principles of our Constitution but who was formerly a Nazi, can be required to prove that he has completely renounced and repudiated his attachment to Nazism. It was in this respect particularly that the district court found that the petitioner's evidence fell short of that convincing character which the situation demanded.

■ There is nothing in the statute, nor in the cases decided under it, which would permit a court to deny naturalization to a petitioner solely on the ground that he was at one time a Nazi, however devoted he may have been at that time to Nazi principles. Nor could a court properly deny petitioner's application on

---

1. The Naturalization Examiner, who reached substantially the same conclusion as did the district judge, also had extensive opportunity to observe the petitioner during his testimony which had covered a period of several days.

the ground that his wartime activity in behalf of Hitler's Germany would have constituted treason but for his timely acquisition of German citizenship. No past conduct of this kind, however deplorable, will bar access to citizenship to one who can establish that his ideas and allegiances have undergone a genuine change and that he is now, at the time of his petition for naturalization, in all good faith attached to the principles of the United States.

In the present case the district court did not purport to hold the petitioner ineligible for naturalization because of his activity during the war or because of his past adherence to principles which were hostile to the principles to which he now claims attachment. On the contrary the judge searched the record for evidence that the petitioner has changed his views since 1945 and is no longer sympathetic to a political system so completely at variance with the principles to which he now claims allegiance. The court sought without success to find in petitioner's testimony any convincing renunciation of the former allegiance, let alone any expression of abhorrence for the Nazi system and its crimes.

Giving due weight to the district court's opportunity to observe the demeanor of the petitioner we cannot say, in reviewing his testimony, that the conclusion of the district court was clearly erroneous. It is difficult to find in that testimony any direct, uncomplicated repudiation of the Nazi system. Partial repudiations are qualified and explained. There are repeated attempts at justification and rationalization. An American may be "mistaken" for sympathizing with Germany "but Americans can be for the underdog." The United States was a republic, "but the Soviet Union was called a republic, too". This took time for him to "understand." Whether he would have fought in the German army against the United States was "a purely hypothetical question", because Germany had the "humane policy" of not assigning former foreign nationals to fight against their former countries. When he was naturalized in Germany he took an oath of allegiance to Germany "but not to Adolf Hitler."

Petitioner's testimony on his reasons for going to Germany and adopting German citizenship is open to the construction that he found (and now finds) no contradiction between attachment to the United States and attachment to Nazi Germany.[2]

2. "I was born an American, and as I see it, have always been one, in a very important sense. I took German citizenship because I wanted to take part in a critical situation and in a conflict between Germany and some other European powers, and for reasons of sentimental attachment, partiality or sympathy, I wanted to give the German side my assistance. But this did not make me a German in that essential sense. I accepted the obligations of citizenship, but this did not deprive me or rob me of my birthright, my upbringing, my American background, my attachment to American institutions or the American way of life. And—I could not predict the future—but my view in 1939, when I took German citizenship, was that, heaven knows what the future will bring, I intended to marry a German girl, who was also British, and that if we would have a family, that one of the first things I would do would be to bring them to the United States to have them meet my family, and, thus, to form a sort of living bond between the two aspects of my family and of my own development; and I intended that my family should get to know the American way of life and live here; and I also wanted them to know the German side of their heritage. Now, I did not predict the course of the war or even the course of my own life. As things have developed, and as I saw the course of my own life or the course I should pursue, I felt that after the war it was my duty to, as with all other Germans, to explain what had happened, what their actions had been and what their responsibility had been for all things, good and bad, for which Germans were responsible during the war. * * *."

"During the years '33 to '36 when I was in college in the United States at Ohio State University and at Bard College, the subject of political discussion most frequently among students was, I think, the two political revolutions of this half century. Many student groups were greatly interested in the communist rev-

And he finds an "ironic" parallel between the present situation with his son in the American Army in Germany protecting the West against communism,

olution, the development of the Soviet state, and in those days we didn't automatically think of anybody as a communist or as a pro-communist if he had an intelligent interest in a world-shaking event such as the 1917 revolution in Russia. We had socialist student groups and all sorts of political discussion and action groups on the campus, pacifist clubs, There was also among those students at all interested in world affairs a considerable interest in what happened in Germany after 1933. Around 1936–'37 when I decided to go to Germany, or wanted to go to Germany, these two matters met in the Spanish Civil War. Many of the students were violently on the side of the so-called Spanish Republican Government, and the extent to which that government had to fall back on communist assistance was—or was controlled by communist groups, was not yet apparent. Some of the students and some whom I knew volunteered for the so-called Abraham Lincoln Brigade, which went to fight in Spain, as they thought, I think, in good faith for the defense of democratic principles or on behalf of a democratic government. I was not bitter about this, and I see no reason to condemn a young person for a genuine idealism in going to offer his services to fight in the army of a foreign power, and I never warned those young people at the time that they might jeopardize their citizenship by doing so. I think these men, insofar as they survived that war, my fellow students, have returned to the United States and their American citizenship and their Americanism has not suffered any damage from it or any lasting damage. We observed also, of course, that in Spain there was an intervention by the Fascist states, Germany and Italy, and this problem never has been solved, it bedevils political thinking today—which course was the wise one to take, was the course which was taken the best, and so on and so forth. I don't have the answer to that. I did see the world picture at that time in a very simple way, and I don't wish to portray myself as a simple-minded individual but certainly as a student I was no expert in political science. My history background was just as weak as that of any other sophomore in college, and I had more enthusiasm and idealism and more belief in my own powers of analysis than perhaps was justified. As I saw it, therefore, this country was not an island, it stood in the midst of a group of countries, which we refer to, for better or worse, as Western Civilization, or simply, the West. There is such a thing, and this West, as I saw it, was threatened by a revolution, a communist revolution, and I didn't look upon the communist revolution then as a welfare action to provide bread for the masses but as a political struggle to overthrow all those institutions, good, bad and indifferent, which go to make up the life of the countries of the West. As I say, this may be a dangerous over-simplification, but so I saw it. And I looked upon the revolutions in Italy and in France, for better or worse, as an attempt on the part of those Western countries most exposed to this danger and furthest east, shall we say, to meet the communist threat to their internal structure in the most practical way. I think the communist-fascist struggle in Germany did not take place in 1933, it started in 1918. It was concluded, for the time being, in 1933, with the assumption of the National Socialist Party; but once the struggle was settled in one country it would go on in another. It went on constantly in an ever increasing degree. And I believed at that time that the aim of the Soviet Union was the conquest of Europe and of Western capitalistic societies, and I thought that as the program developed, I believe roughly from 1935 on, Stalin proclaimed what was more or less known as a United Front, that is, all countries opposed to Fascism were supposed to unite and crush this dangerous threat. Well, I thought I knew better. I thought that the communist threat was really the bigger threat, and that this was simply an attempt to eliminate the most vigorous source of opposition to communism and, therefore, I decided to put my, to use the colloquial phrase, my two cents worth in defense of that form of society in which we lived, there, where it was most endangered. I don't think when I, in speaking of the years 1936 to 1939, the prewar years, when my decision was being formed, almost without my knowing it, that I was a freak in this respect. I read only a few days ago a book by an eminent American general, Mr. Wedemeyer (phonetic), and he attended the German War College from 1936 to 1938, and he speaks in great length in his book about the picture of the communist or the Soviet threat to Europe and to the United States and to the West, in general, that he formed during those years in Berlin. And he is quite frank in saying that in his opinion, and he was one of America's top war

and his own action in taking German citizenship to help. protect the West against communism.[3] (Although Sittler insists at great length that he was motivated in adopting German citizenship by fear of communism, it may be noted that he became a German citizen shortly after the announcement of the Hitler-Stalin pact.)

Petitioner was extremely prolix about reasons for joining the Nazi party, but, in summary, perhaps it can be said that petitioner thought of the Party as providing the best hope for Germany's future.[4] He was under no compulsion whatever to join the Party. He thought that he could make the Party better by joining it. However although petitioner

strategists, that the Soviet danger, to his way of seeing, was a greater threat. He may be very mistaken, too, but this was the picture, roughly, which I formed and, therefore, the outbreak of war in 1939 seemed to me to be just like the outbreak of the communist or the Civil War was in Spain in 1936. Here the threat to the West was once again obvious in a major form, and what would be done to meet it? I seriously thought then, in 1939, when the dispute ranged around the Polish Corridor, the City of Danzig—this seems almost ridiculous now, it was obviously not the real cause of the war, it was an incident which led to its outbreak—that if the various countries of Europe, who were, as I saw it, blind to this communist threat, were all to descend upon Germany from their various positions, that there wouldn't be any Germany left. I can see that this, too, was not a masterful analysis of the European situation then. But, again, if I may refer to General Wedemeyer, he says that if the countries of Europe had acted in concert in 1939 they would have been able to dispose of Germany's armed threat or whatever you wish to call it. So, although this may seem rather academic that I direct my life and make such an important decision because of a theory or a view of our civilization, yet, this is actually the case—that the way we see the world is the way the world is to us, and I saw it divided, a threat from outside our community which we would have to meet and sometimes the defense that we can make is not the best, and I never imagined that everybody in Germany was perfect and humane and much better than anywhere else. I regarded it as a frontier to which I was going, to venture my abilities and such strength as I had in defense of a bastion or outpost—threatened outpost of our civilization. I don't wish to speak in grandiose terms, but I think that that was the situation in 1939, as I saw it then and as I tried to tell you about it now, in 1960."

3. "And I think of the identical geographic situation—I find by an ironic biologic jest, that my own son—as you know, he is a

German citizen—and he is in the American Army—and he is stationed in Germany because there are Soviet armies a couple of hundred miles away. This was not the end to which we were all working or all well-intentioned people wanted to work for in the 30's. I think the destruction of any people, Russian or German, is a poor aim, if not to say a criminal aim, that there must be understanding reached and adjustments reached. But sometimes developments reach a crisis and a threat to one's very existence is posed, and I don't think it should be—I didn't think in 1939 that it should be denied to an American citizen to say—I think the existence of this people and this country is threatened. I think that it should be preserved. I am going to do what I can as an individual to see that it should be preserved. —And in so doing I did not wish to compromise my fellow citizens. and say you should think the way I did, or you must say I am right. I said—I am renouncing my American citizenship in order to do what is absolutely essential for the preservation of this country because it is essential to the preservation of the United States. For better or worse, this was my thinking at that time, and that's the reason, the principal reason, that I took out German citizenship and went to the American Embassy and made it clear to them that I was renouncing my American citizenship. There has been since that time, in various discussions of my decision, a confusion of the terms denunciation and renunciation. I gave up my American citizenship not with joy but because I felt it was fair to the country of my birth and origin, but I have never denounced the United States or American principles, or what I thought this country stood for. And if I am deceived in that, I am still in the process of learning about it."

4. "Q. Would you state the reasons for joining the National Socialist—Socialist Party in Germany, if you remember? A. Yes. Well, there were several, and it had become obvious to me from my experience in Germany that this was the Party, of course, which was in control of

joined the Party partly to reform it, he never attended a meeting or engaged in any other party activity. Petitioner testified at a later point that he joined the Party because he knew by this time that the war was lost and he thought the Party would be able to give the German people some leadership after the debacle consequent upon the unconditional surrender policy which the Allies had formulated.

In petitioner's testimony there are lengthy "explanations" of Nazi tenets, some of which may be read as denials or defenses.[5]

Germany, and I was continually surprised by the people who were in it and those who were not in it. There was no pattern that I could make out. For instance, the German radio—I believe that my immediate superior was a Party member, but the next superior above him was not, and the head of the whole overseas radio was not, not, not to my knowledge, so I could not perceive any Party operatives there, but in the state, in general, and in more important affairs than the radio it seemed that there the state was going to go—be saved and the people be saved or go to ruin through this Party. The degree to which the people would put its best brains into this Party seemed to me to be the answer to whether the people would save itself or not, and I had noticed that in my experience with Germans, young and old, that there was a tendency on the part of all so-called educated or better people to be what the Germans called apolitish (phonetic), un-political, and I think this may arise from my American background—if you don't go into a party yourself and attempt to influence public policy you haven't got any kick coming, but if all those who thought they knew better or knew what was the right thing to do would have entered a party whose program, I believe, in its essentials, as it was stated in its written program and not in what later developed, made themselves felt or made their better knowledge felt, there might have been a much healthier development in Germany."

5. For example:
"Q. Wasn't that one of the basic philosophies of National Socialism—that such a folk state existed within the German blood? A. Well, as I understood it, the idea was to try to get the structure of your state as close, to conform to whatever the innate desires and capabilities of the people are. Now, I don't think this was a National Socialist idea. This goes back 150 years to the Romantic period, when they thought a state and its people should try to be as correspondent as possible.
"Q. But didn't National Socialism adopt that idea? A. They claimed that they were going to get closer to it, and I think they were grossly in error in some parts, and in other parts they must have had a point or we couldn't have seen the enormous manifestation of the popular response.
"Q. Did National Socialism advocate race superiority? A. Well, in its program it didn't, but I think that some people within it, say, Mr. Rosenberg and a few others, spoke of an Aryan race, which is a non-scientific concept, and said that these—this race, which, of course, is distributed all over the Western world and not only in Germany, were the bearers of what they spoke of as culture, and historically, historically they have a point, but they made the wrong deduction. Civilization since Greek and Roman times has been, as we see it, more among white peoples than among black peoples, but if they are in a state of primitive civilization, it hardly argues that they can't go beyond it. I didn't share that view.
"Q. Do you believe in the superiority of the German blood? A. I never heard that doctrine proclaimed. I would have to ask you to show me one responsible man who said the Germans were superior to any other people, if—
"Q. You never heard Goebbels say that? A. No, I didn't.
"Q. Ever hear Rosenberg say that? A. May I—
"Q. Just answer that question—you can inject your comment— A. No, I did not.
"Q. Now, what's the comment? A. At Northwestern University in one of my German classes, this very question was raised, and trying to follow my philosophies as a teacher, which is learning by investigating the facts, I advised that student to go to the library and get out the handbook of the Hitler Youth, which discussed the racial structure of the German people, and he could see there that the official handbook of the Hitler Youth described the German people as being only in part of this so-called Aryan race, and the rest was made up of a composite of races, such as people in other countries also are, and I could find no reference in there to a superiority of the German people over any other people. If you have such a thing you must show it to me. I

In 1944 petitioner criticized the German propaganda effort in a memorandum which read in part as follows:

"All German propaganda to foreign countries must be National-Socialist war propaganda in its most representative sense. It must interpret and present not only the military, but all national events and forces in the light of the ideology, which, for the very reason that it releases the powers of the people and raises them to their highest potential, is necessarily, fought against through war by an Anglo-Saxon constellation of States whose own organic weaknesses make them regard the recovery and self-assertion of the Reich, as a danger and a challenge."

His testimony explaining the recommendations of this memorandum is, at best, equivocal. At worst it may be read as a justification for Nazi "philosophy." [6]

think this aspect is sometimes misrepresented. I think some fringe fanatic may have published pamphlets along this line, but I didn't read them and I don't believe such statements, and didn't believe them, and I think a great many intelligent Germans didn't and don't—"

"Q. Were you familiar with the German term 'lebensraum'? A. Yes.

"Q. And what was that—what did that term mean to you? A. Well, the term, as I understand it, is a term of geopolitics, which is a study—also known in English-speaking countries, and refers to that geographic area which a country or a nation needs for its maximum development as a unit and this may go beyond its borders. You may reckon to its lebensraum certain areas which have some connection with its political or economic existence, such as the Soviet Union has asked to recognize the countries surrounding its borders as being somewhat important to its defense, and the United States has so recognized these areas. So this was not a new concept.

"Q. Was it a concept or philosophy of the National Socialist Party? A. I don't think so, I think it is a universally, centuries-old recognized concept of political facts of life. The American lebensraum stretches far out to the Pacific and somewhat to the south and north, and, everybody will recognize this.

"Q. Did you ever feel that the state should be all powerful and exercise complete control over all individuals within its jurisdiction? A. Emphatically, no, and even in Germany I never behaved as though I believed that, or I would not submit a memorandum of such vigorous criticism, as I did.

"Q. Were you in favor of the German idea of Pan-Germanism? A. If by that is meant that Germans should be united into one country, I thought this was a desirable aim, if it were done in a reasonable way."

6. "Q. Did you believe that the broadcasting set up as it then existed did not effectively promote National Socialist philosophies? A. I understood that the war was going on between Germany and other countries, and the war was not for the propagation of National Socialism. I thought it was for the existence of Germany and the German people were at stake.

"Q. And did you believe that the people in the United States should be advised of the National Socialist philosophies? A. I thought that they should get as complete a picture as possible of what Germany was and what its aims were and what it ought to have to exist reasonably in the contemporary world."

"Q. I read to you the opening few lines of this treatise on German radio propaganda to the United States, government's exhibit 11, and you state—all German propaganda to foreign countries must be national socialist propaganda in its most representative sense. I ask you what you mean by that? A. The crucial question here is what is the most representative sense. By that I meant the best sense.

"Q. What did you mean by national socialist philosophy? What was this national socialist philosophy that you speak of? A. National Socialist—as I understand it, there are two crucial terms here implied—that there is such a thing as a nation, there are certain characteristics and aims and histories and traditions that make up a given nation, and that these are entities that should not be tampered with or destroyed. They must be understood in order to deal with them properly.

"Q. What were these national socialist philosophies which you felt must or should have been understood? A. I did not say here that the national socialist philosophy must be propagated. I said here that it must be national socialist,

small 'n' and small 's', in its most representative sense, as I understood it, the national socialist government was trying to build a state which should embrace in it all people who were German, however—you want me to define it? And within that state there should be a socialist economic structure. In other words, a country in which—that the nationality principle was combined with the socialist economic structure—

"Q. In— A. —I felt this was a defensible idea, and this is what they should try to talk about.

"Q. Did you believe in corporate control of individual activity? A. No.

"Q. Well, what did you mean by the socialist concept of economics that you just referred to? A. By socialist I understand a structure in which the economic process is controlled and based upon the welfare of the majority of the people and where ownership, say, of various corporations can not be vested in one person, where there is, if nothing else, state regulation of the excesses to which private capitalism may go. This is the general direction in which the American economy has been moving steadily for the last 20 years.

"Q. What did you consider the national socialist philosophy on politics to be? Did you believe in a legislative branch being subservient, say, to the head of the state? A. The national socialist program did not produce or develop any theory which would provide a system of government. It was said during those years that they wanted to develop the school in the country which would take the most talented students and train them for government service, and they would gradually develop a civil service, and the reichstag was to be continued, and they were to choose the most competent members to guide the state, as council—as a group of councils. This was all very unclear, but it was talked about, and it would have had to evolve over a period of decades. I think it's like the Soviet constitution—it's a beautiful document but it's going to take decades for the Russian people to make their influence felt and develop those responsible organs with which they can express popular desires."

"Q. I still don't understand what you mean when you say that all German propaganda to foreign countries must be National Socialist propaganda in its most representative sense? A. I think there was a sense in which National Socialism was representative of all peoples. All peoples have nationalistic tendencies. And as there is in America, quite apart from its geographical limitations—other Americans say that the name shouldn't be used for the United States—but, still, most of the Americans say America and they mean the United States, not Canada. So I think these nationalistic ideas can be dangerous, but they are only dangerous, potentially, because they represent values. They do exist.

"Q. What was some of these national socialist ideas which you felt should be viewed—which should be communicated to the American people? A. I don't understand that sentence to say that national socialist ideas should be purveyed to the American people, but rather, that German realities must be portrayed in the most representative sense, that is, there is a German nation—what is it? I am afraid that, for instance, in the United States they look on Austria and the Austrians as a separate country, whereas their histories have been intertwined for a thousand years, and the Austrians did not, to my, to my own seeing and hearing, when I went there as a visitor, I did not find indignation in Austria over being joined to Germany. On the contrary, I found great enthusiasm, and maybe this was a great mistake to hang on their fate with Germany. That's what I meant.

"Q. National Socialism had certain philosophies on politics, correct? A. Well, I wish there were a satisfactory definition of what it was. I don't think it ever, ever offered a comprehensible and clear philosophy of government. They didn't get that far.

"Q. Didn't National Socialism favor a supreme head of state? A. I'm sure, yes, it had this fuehrer concept.

"Q. And what was the fuehrer concept? A. He was the—to be the leader of the people.

"Q. Right. Was he to have blind obedience? A. That's what he asked for, yes.

"Q. Was this the type of national socialism—socialist philosophy you wished to convey to the radio audience? A. Absolutely not, and I do not believe there is one sentence of mine—and I repeat again that my broadcasts have never been put in evidence here—that I never broadcast one line in which I asked the American people—Please to adopt the fuehrer concept—but I did say, as Winston Churchill said in 1936—if this country is ever in such a crisis—I'm quoting Mr. Churchill—if my country—this is roughly what he said—is ever in such a crisis, I hope that God will grant us such a leader. Now, I was no more prescient

Petitioner's testimony characterized his propaganda efforts on the German radio as inspired by an interest in getting the truth broadcast.[7]

In his propaganda broadcasts petitioner testified that he was not speaking for Hitler but for the twenty million men who were fighting, not for Hitler, but for the future of their country.[8]

Petitioner invented fictitious news items for his radio broadcasts because "given the mythical nature of this station,[9] that is, it was a farce, a practical farce, I saw no harm in this, no harm could possibly be done." "I don't think that anybody ever took these programs seriously or these news items". "If this man wanted to pretend or said he was somebody speaking from the heart of midwestern America when it was a short-wave band, a small weak signal on an overseas station—I don't think any-

in 1936 than Mr. Churchill. I felt it was a crisis. This was not a thing for all Europeans, it was not something for American people, but only for German people, to solve a specific problem and I would now say I was very, very mistaken. That's about all I can say.

"Q. In 1940, though, had you accepted this socialist—national socialist philosophy on government? A. No, I had not. I had felt, I thought that for Germany it offered the solution at that hour. But I had not accepted as my philosophy in the sense that I thought this is the form of government that all countries should, because I believe that every nation should have the form of government which it deserves and which it wants.

"Q. Would you say one of the basic principles of the Nazi Party was this idea of a fuehrer? A. I think it was basic, yes.

"Q. Do you consider a dictatorship or totalitarian state as the ideal natural form of government for people? A. No. I do think, I thought then that times occur in the lives of people, crises, when a dictatorship occurs and that this could, was, perhaps, the only answer to a specific problem. I would now say no.

"Q. What did you— A. Even if it seems to offer an answer—don't accept it.

"Q. What were you thoughts in 1940 on that subject? A. That this man seemed, Hitler seemed to have a specific practical solution to Germany's problem.

"Q. Do you believe in a single political party? A. Absolutely not.

"Q. Did you ever believe in a single political party? A. No.

"Q. Wasn't—do you know if a single political party was one of the principles of national socialism? A. If I understand it correctly, their idea was to build a state that was so close and so corresponding in harmony with the people that the people's wish would automatically sort

of syphon upwards into the government and, therefore the government was not a party, the government was the people. Well, we want the government to be of the people, by the people and for the people. They were, I think, a bit on the crazy side to think they were going to bring the perfect solution to this eternal problem of how you get the government to be as responsible as possible to the people."

7. "Q. And you knew Mr. Chandler was under indictment for treason in the United States? A. I did.
"Q. And you supplied him with these hints or aids to improve his program? A. I did not wish to provide him with aids to treason. I was interested in getting the truth broadcast."

8. "I had—did never say in my commentaries that Adolph Hitler was the salvation of Europe or that by upholding this man that Europe would be saved. I concentrated upon what I thought were the military and political, developing facts and thought in my somewhat academic way that once you speak out the facts this was all you can do, that that they will speak for themselves. And I thought that I was speaking a word on behalf of 20,000,000 German men who were fighting not for Adolf Hitler but I'm sure, in their hearts, for the future of their own country, and who had very little knowledge of the things which had rendered the very existence of their country so questionable at home."

9. The station was called Station Debunk and was supposed to be located somewhere in the United States. By the word "mythical" the petitioner apparently was referring to his testimony that the station's power was so weak that it was unlikely that listeners in the United States would be fooled into believing that it was actually located there.

body in his right mind would have swallowed this, nor was it intended to be swallowed". It was all "a joke". (When asked whether the motive of Burgman, a radio propagandist, with whom petitioner worked, was to cause the people of the United States to lose confidence in their leadership) "Burgman had a motive, I had a motive, Mr. [X] had a motive". Burgman never informed the petitioner what his motive was. Petitioner could have refused radio assignments and received military punishment for doing so,[10] but in taking assignments he was not motivated by fear of punishment. He was willing to do "his duty as a German citizen".

Petitioner testified, apparently with some pride, as to his proposal for solution of the "Jewish question", a proposal which would have exiled "the minority" but permitted them to take their property with them.[11] In any event the persecution of the Jews was not as all-inconclusive as it was generally reported to be[12] because petitioner knew personally some army officers who were Jewish or part Jewish. (The point here is, of course, not that the statement is false. Possibly it is true. But one may be permitted to ask what kind of man raises such a point in the context of the established fact of the extermination of millions of Jews.)

Petitioner testified at great length as to why he could not briefly and succinctly condemn Hitler and Nazism.[13]

10. Petitioner had been drafted into the army and then reassigned "on deferred service" to the radio station.

11. "Q. What steps did you take to try and correct the faults of the Nazi Party? A. I think, as I told you, there was no great political program or series of steps, but in the small sphere of an individual, I felt that the more the Party member could associate himself with honest feelings, with humane attitudes, with a sensible policy, that this would inevitably be the only contribution that an individual could make to the future development of this country. Now, I might say that among my acquaintances and students that the Jewish question was discussed, for instance, not the question of concentration camps, about which, in my opinion, the majority of people had no factual knowledge, but the knowledge that there was a government program directed against the Jewish minority, a discriminatory program—what was to be the future of the German people in relation to this? What about the confiscation of property or economic sanctions taken against a minority, and I remember, and I believe that people who knew me at the time can remember—that my attempt to say something sensible on this clash of interest was this—that if within a given country, such as Germany, a majority of the people and a minority come to a point where they cannot discuss and mediate with one another any longer and there is a real impasse, then it is the duty of the majority to see that the minority suffers no loss, that if they cannot live together, they must say—Here is what belongs to you. We will find for you a place, and here is what belongs to you. Some such solution would have to be found. I can envision, say—the creation of the State of Israel was such a solution, and the German Government is now making a small contribution in an attempt to do what they should have done a long time before. Now, I think I can fairly claim that although this is certainly not a perfect solution it would have been a humane one or, at least, a step in the right direction."

12. "Q. Could a person married to—a German married to a Jewish woman gain membership [in the Nazi party]? A. There were all kinds of exceptions, there was a field marshal in the German Air Force, who was Jewish.
"Q. Was he a member of the Party? A. He was, yes, I don't know how these things came about. I know of my own acquaintance some officers in the German Army who were Jewish or part Jewish, and I didn't feel offended by this, but I don't know what the apparatus was."

13. "If you think that my answers now are too long you should have heard the answers I gave at Post College, as I felt I wanted to be clear in answer to one of these deceptively simple questions—What do you think of Adolf Hitler? It is contrary to my way of thinking to say—He is a bad man. I don't think this answers the seriousness of the question. I probably—I know that I launched forth into a number of five minute—a miniature lecture in order to get at the root of what I felt the answer should be."
"For instance, the statement was printed in the Post in response to the ques-

The passages cited as favorable to the petitioner are the following excerpts from his testimony:

"Q. Tell us, then, what are your present views about Adolf Hitler and his regime. A. With regard to this one question to which my reported answer was that I could not judge him, what I said at some length, and repeatedly, was that between persons who are trying to arrive at a truth answer and not just agree with one another, that it is useless to say 'I condemn Hitler.' We must be specific.

"I condemn many actions of many statesmen, and looking back upon their whole activity I can condemn them in toto.

"I said that Hitler was a scourge of mankind; that it was a disgraceful and a tragic chapter in German history, but this does not remove the fact that Hitler was an almost unavoidable, perhaps an unavoidable accident or happening in German history, and that the responsibility cannot rest upon him alone, but it rests upon the whole German people, their tradition, the way they did not come to grips with it, and therefore just to condemn the man without condemning all those things which produced him and brought him forth, and which helped him to be what he was—and they were not only in Germany alone—the answer served no purpose for our discussion as man to man.

"I can say, however, at any time that I condemn absolutely Hitler for what we now know him to have been, but I did not know that in 1937, nor did I even have enough sense to know it in 1939.

\*    \*    \*    \*    \*    \*

"Once the outer conditions which led me to adopt German citizenship in the first place had radically changed, I tried to adapt myself and

tion—What do you think of Adolf Hitler? —I cannot judge Adolf Hitler. —This, in classic severity, was supposed to have been my answer. Whereas in truth, I held forth on this important subject, I am sure, for five minutes, and the essence of my answer to that, which I have answered dozens of times in the last 15 years in the same way, is roughly this: That Adolf Hitler was a political revolutionary, who, later, as dictater of Germany and in secret with a group of officials, committed crimes, the enormity of which staggers the imagination. And it is utterly inadequate to say he is a bad man or he is just a criminal, because these crimes far exceed the normal understanding—a jail sentence, a jail sentence is, for instance, no answer to this problem; that this is a question of human evil, to a degree that doesn't confront us smaller individuals, but which we come up against as citizens of a state, if we find ourselves in such a situation and, therefore, we can damn it; that's all we can do. But the actual problem is while it's going on and developing—how do you spot and recognize it? Out of just such minor infringements of civil liberties and infringements of the rights of the individual grow such monstrous things as happened under the National Socialist government in Germany, or, at the expressed order of Hitler. And this is the important thing. When we see pictures and hear figures of millions of people killed, it's too late. So that our emphasis must be to find out the source and the original of these things, and not to simply indulge in say—saying —He is a bad man. The important matter is to get back to the source in most people, most well-meaning and innocent people who have agreed to, or overlooked or gone along with, like, you might say, programs which are heading in that direction, which they do not see yet the consequences of. So I'm willing to go along with—and I said this to Mr. Poston in the strongest words of condemnation you can find. But far more important than just to indulge in condemnation—it's far more important to find in one's own thinking the possible sources of error which gives vent or impetus to such developments. So I would put Hitler among the few scourges of mankind. I think Stalin would have to be nominated at the same time. But it doesn't help us understand communism or Russia or the problems of the Russian people to say that Stalin is a beast in human form. I feel that we have got to bring the problem back to each individual in that country where the problem arises, and I say this with regard to myself because no one was blinder or more stupid in that regard than myself."

my family to these new circumstances and to restore the balance.

"I could not become a German by taking out German citizenship, and in order to go on teaching and being what I think I am—that is, somebody who has lived in both countries, who has ties in both, who has studied both—how this function of making clear the relationships between the two could be carried out best.

"I came to feel in assessing this whole situation over a period of years that it would be best carried out here. This was where my work was to be done primarily, and since my children were born and raised here, I felt that I was only adapting the outward form of my citizenship to what the realities of my own life and my family's life were by reassuming or asking for American citizenship again."

These passages are not without their share of equivocation; and when read in the context of the record as a whole they fail to carry with them that note of conviction which would permit us to hold that the district court's determination was clearly erroneous. Moreover the petitioner's statement of his reasons for wishing to become a citizen do not serve in any way to support his allegation of attachment. Basically he seems to want citizenship because he has had difficulty holding a job as a college professor and believes that his chances of doing so would be better if he regained his citizenship.

Much is sought to to be made of the testimony of Woerheide, a Justice Department attorney. But when reduced to its essence, by eliminating far the largest portion of it which related to the cases of Sittler's friends, the traitors Burgman, Chandler and Monte, Woerheide's testimony is found to be directed mainly toward the proposition that Sittler was an unimportant cog in the Nazi machine and the, for us, irrelevant proposition that Sittler's performance of acts which would have constituted treason but for his taking German citizenship, does not reflect on his moral character. The district court did not hold, and we do not suggest, that Sittler's citizenship should be denied because of bad moral character. The only issue is whether Sittler has established that he is attached to the principles of the Constitution of the United States and well disposed towards its good order and happiness.

██ It is true that Woerheide, as well as several other witnesses, testified to the opinion that Sittler would make a good citizen. But, while this conclusion may be helpful to the court in reaching its own decision on all the evidence, the court is, of course, not bound to accept the views of these witnesses. Moreover the statutory test of eligibility is not whether Sittler will make a good citizen, but the considerably more specific test of allegiance as defined in the terms of the statute itself.

From a reading of the record one could readily conclude that the petitioner is by no means the kind of man who would never be able to qualify for citizenship. If at some time in the future he should find himself able without qualification and without equivocation to renounce and repudiate his former allegiance, and to demonstrate his attachment to the United States, he can then be admitted to citizenship. On the present record we cannot say that he has done so so convincingly that we may hold that the district court, which had the advantage, not available to us, of observing Sittler's conduct and demeanor while testifying, was clearly in error in denying him citizenship.

Judgment affirmed.

KAUFMAN, Circuit Judge (concurring).

I concur completely in the opinion of Judge HAYS, which I find to be a model of the "intelligent and complete, more persuasive just because * * * intellectual, nonemotional" form of exposition extolled by the dissenting opinion. Because of the great significance of this case to the appellant, I think it proper to

comment upon certain of my dissenting brother's erroneous characterizations of the position taken by the majority of this Court.

The underlying theme of Judge CLARK'S dissent is its accusation that the majority has failed to evaluate the character of the petitioner as he is today, but has devoted almost its entire opinion to an examination of petitioner's conduct and beliefs beyond the five-year period rendered crucial by 8 U.S.C. § 1427(a). It is more than clear in the opinion of Judge HAYS that our affirmance does not rest upon proof of past misconduct but rather upon the light which that misconduct sheds upon petitioner's *present* devotion to our constitutional principles. Is it unreasonable to expect that one who has participated in some way, however small, in the most shocking exhibition of man's inhumanity to man would *today* be able without qualification or hesitation to renounce it? *That* is the relevance of the past, which we are invited to consider by 8 U.S.C. § 1427(e).

The position of the majority of this Court is unfortunately put in a disparaging light by Judge CLARK'S repeated assertions that all we seek are "short sentences of breast-beating repentance and patriotic affirmation." He forgets that we sit in review of the decision of a trial judge who—in a thoroughly conscientious manner, as the opinion below reveals—confronted squarely the awesome problem of determining a man's state of mind. If there were ever a clearer example of a question of fact, rather than law, I can think of none. In doing so, he evaluated certain inconsistencies in the petitioner's statements as to his conduct and motivations, past and present. He no doubt noted the incongruity between the petitioner's self-portrait as merely a small cog in the Nazi system and the portrait—which Judge CLARK himself now paints—of petitioner as an "intelligent and well educated individual, given to thinking aloud—perhaps more than he wisely should * *." Surely Judge CLARK'S facile brushwork

does not fairly represent a man who with single-minded, unreflective, and unquestioning adherence to the Nazi command devoted several years of his life as a commentator broadcasting English-language propaganda on a German radio program beamed to the United States. How else can we determine a man's present 'state of mind if it be not viewed in the perspective of the past? Can the District Judge fairly determine that petitioner is presently and sincerely attached to the principles of our Constitution if his renunciation of its complete antithesis is tepid, qualified, contradictory? To say that the District Judge and this majority would not have been satisfied with anything less than "breast beating" and "groveling" is unfairly to characterize our all too reasonable search for a "direct, uncomplicated repudiation of the Nazi system."

We are adjured by our dissenting brother to keep our prejudices up to date. But certainly we should not be oblivious to the lessons of history when pertinent to a case before us.

Judge CLARK seeks to justify the petioner's tepid renunciation of his past in large measure on the ground that he is a man of academic and unemotional nature. But, rather than excuse petitioner's intellectual timidity, I should think that his training as a political scientist would make it so much more inexcusable. For, can we not expect that an individual, who is thoroughly acquainted with the comparative virtues and vices of democratic and totalitarian political systems would be more acutely sensitive to the heinous qualities of the latter? Can we not now expect from him a devotion to our constitutional form of government which springs from an appreciation both of its salutary effects upon the body politic in practice and of its undoubted superiority in theory? More specifically, is not petitioner's condonation of his propaganda activities in behalf of the Nazi war effort made yet more objectionable by the fact that he is characterized as a man of intellect? For it is intellect

which is the chief source and most-sought prey of the modern propaganda effort.

As much as I might sympathize with Judge CLARK'S assertions that no man should be denied the blessing of citizenship in this country unless "there is something of definite evil in what the petitioner believes," or unless there "is any secret allegiance on his part to our enemy in the present cold war," the statutory requisites are somewhat more severe. The petitioner must prove that he is, among other things, "attached to the principles of the Constitution of the United States." 8 U.S.C. § 1427(a). This does not require proof simply of an absence of affirmative allegiance to an enemy power, as Judge CLARK apparently believes; rather, it requires a demonstration of affirmative allegiance to the principles of *this* nation and its form of government. The majority of this Court does not find such a demonstration convincing.

CLARK, Circuit Judge (dissenting).

This is a distressing case; neither in procedure nor in result does it comport with my conception of American standards of fair play and judicial impartiality. True, petitioner, during his Nazi phase down to late 1945, was unattractive enough in his political ideology to justify or at least explain the strictures here heaped upon him if, as has been done, we concentrate entirely upon that early period of his life.[1] But the governing statute requires proof of a petitioner's attachment to the principles of the Constitution only during the five years prior to the filing of his petition for naturalization, 8 U.S.C. § 1427(a), and allows proof of his earlier conduct and acts only for the light it may give on his conduct during the five-year period. 8 U.S.C. § 1427(e). Hence the concentration here upon petitioner's early life *does not comport with the statutory mandate.* Nor is it realistic in the light of modern international relations. Apparently in the troubled world we now live in, it is an obligation of good citizenship to hate the enemies of one's country and anyone who would consort with them. But must we not keep our hates up to date lest we prejudice or poison our country's alliances of the moment? Here the hate at the basis of this decision, both in its administrative and in its legal phases, is now two decades old and quite out of date.

It seems unusual, and indeed worthy of comment, that petitioner's present acts, beliefs, and conduct have been kept so completely out of the case. My brothers do not try to assess what he now is; and only in a succinct statement at the beginning of his opinion,[2] thereafter disregarded, does the trial judge allude to

---

[1]. A balanced history of petitioner's life would undoubtedly point out that he went to Germany, the land of his grandparents, in 1937 at the age of 21, just after the breakup of his first marriage and when he was concerned with the future of America struggling out of the great depression, and that his seeking German citizenship in 1939 and 1940 eventually led him into deeper waters than any of which his naive political generalizations had given him warning, leaving him no point of return until the Nazi debacle of 1945. But he was a grown man and must suffer the natural punishment for his wrong turning at that time. Had he been then visited with doom permanently barring him—like Philip Nolan—from all American citizenship, there would have been at least a certain grim justice in the result. But, as all concede, the statutes do not permit of such a result; and it is

not tolerable to secure it through the manipulation of legal procedure.

[2]. "Petitioner has complied with all the formal requirements of the law, and his reputation and general conduct have been shown to be good. He avows his attachment to the principles of the Constitution and to the good order and happiness of the United States. He produced, at various times, twenty witnesses from among his neighbors, colleagues, pupils, relatives, friends, and an attorney from the Department of Justice, all of whom testified to the effect that he was truthful, law-abiding, attached to the principles of the Constitution, a devoted husband and father, a dedicated teacher, and a man of good habits. None had ever heard him say anything against the United States. All held him in high esteem and recommended him for citizenship. Indeed, many testified that, in their opinion, he would

it, even though the petitioner did present a strong affirmative case. In an appendix to this opinion, I have tried to outline this in brief compass.[3] Here I shall discuss the case attempted to be made against him.

First it should be noted that my brothers excuse their failure to go into what to me is the heart of the case by resorting to a patently erroneous view of the law, namely, that appellate decision can rest without more upon the trial judge's findings unless they are "clearly erroneous." But F.R. 52(a), to which my brothers have obvious reference, states the rule as to the status of findings of *fact*, not a rule as to the application or execution of the law to facts found or conceded. Here the facts as to petitioner's German life, 1937–1945, are well understood and are not contested. As the trial judge says: "The biographical facts are not in substantial dispute. Indeed, most of them come from Sittler's own lips." D.C.S.D.N.Y., 197 F.Supp. 278, 284. And as he says, decision "requires ascertainment of his state of mind, * * * and that can be fathomed only by the credibility of what he says and the reflection of his inner views by his outward conduct." 197 F.Supp. at page 280. This obviously calls for the highest skill and the most careful judgment in making deductions and drawing conclusions as to the application of 8 U.S.C. § 1427(a) in the light of the conceded facts. Hence we have a prime question of law and cannot hide behind the gown of the trial judge. Indeed, to attempt to do so is, I submit, to show a lack of judicial candor. I realize, of course, that the result would hardly have been different in any event; the opinion's cumulation of only items derogatory to the petitioner shows my brothers' inherent sympathy with the ruling of the trial judge. Nevertheless the responsibility is clearly ours; we cannot and should not attempt to evade it.

As the trial judge thus indicates, the attempt was made to convict Sittler out of his own mouth. So he was subjected to a long and hostile cross-examination —on six occasions, covering about 200 pages of the typewritten transcript before the Hearing Examiner, and on a later occasion in an additional 50 pages before the district court. The court tried to find positive misstatements, cf. 197 F.Supp. 284–286; but against the background of Sittler's main admissions of all essential facts, these appear trivial or but natural failures of memory of details twenty years after the events. They were not relied on by the Hearing Examiner in his report or adverted to by my brothers in their opinion, and may thus be dismissed. The case is rested entirely upon Sittler's ideological concepts as disclosed by these searching examinations. And since at all times he answered patiently and at length, a regular field day in abstract political theories and history has been indulged in. But what all this actually proves is another question. On this crucial problem I do not find my brothers' opinion enlightening. Their strong condemnation of petitioner's views is made abundantly clear, but what there is so uniquely offensive in them as permanently to bar him from citizenship is anything but clear. I had supposed our country was a place for people of different, even foolish, beliefs; unless there is something of definite evil in what the petitioner believes, I do not see how he can be barred. And of this there is certainly no showing.

The petitioner is obviously an intelligent and well educated individual, given to thinking aloud—perhaps more than he wisely should—about his own past and what has happened in the world, rather than to pronouncing short sentences of breast-beating repentance and patriotic affirmation. Here quite obviously is where he made a mistake, so far as the success of his petition might be concerned. My brothers, the trial court, and the Hearing Examiner all make it clear that he did not show the proper

make a better than average citizen." 197 F.Supp. 278, 280.

3. See Appendix, pp. 328–330, infra.

contrition and repentance. In other words he did not grovel as he should have done.[4] To me this would not have carried conviction; what he said seems more in keeping with his character as otherwise disclosed. I should think his repudiation of Hitlerism and of his own past conduct was intelligent and complete, more persuasive just because he has attempted to explain it in intellectual, nonemotional terms, rather than merely to resort to a show of sackcloth and ashes. And of course this must be evaluated against his later career of studying and teaching, not to speak of the efficient aid he rendered our Department of Justice prosecutors in the several later treason trials. The opinion contains copious quotations from his testimony, and I suggest these be read with care. I can only say that they do not seem to me to show what they are quoted as showing or to indicate a secret intent to harbor designs against the peace and prosperity of the country. And this all seems to me particularly unreal, as there is no Nazi country for which he can retain concealed affection; thus altogether improbable is any secret allegiance on his part to our enemy in the present cold war. So he is being barred from citizenship on abstract grounds lacking reality or pertinency, while his solid case goes unheeded.

In what seems to me a very cruel touch against this background, my brothers dangle the prospect of a later more favorable consideration of his case should he find himself able "without equivocation" to demonstrate his attachment to the United States. The implication of course is that if he will grovel suffi-

ciently he may have a chance of admission. The stated condition does not seem likely of fulfillment; that this 50-year-old intellectual should suddenly change to beg forgiveness, etc., etc., does not seem likely. But if he should, he would certainly show himself so lacking in any sincerity that his application must be rejected. Thus my brothers have neatly constructed an insoluble dilemma for him which will bar his citizenship so long as this precedent stands.

But I venture to believe that this court in a very few years at most will come greatly to regret this decision and the rationale upon which it is based.

## APPENDIX
### SITTLER TODAY

If we focus on the statutory period of five years preceding Sittler's application for citizenship, we find almost nothing that can be taken as evidence of his disloyalty to American principles. At the start of that period, Sittler, who had obtained a Ph.D. degree from Northwestern University in 1950, was head of the English department at Shurtleff College in Alton, Illinois. He represented the college at the 1956 convention of the American Association of University Professors, where academic freedom was an issue. The convention adopted a statement of general principles supporting free intellectual inquiry, and Sittler testified as to his agreement with the statement. He also testified that while at Shurtleff he waged a successful campaign, writing letters to the Association, for the reinstatement of a professor whose dismissal, Sittler believed, abridged academic freedom. Sittler at-

4. This form of apologia for the result here seems to be reserved only for the special case of an American turned Nazi, and not to be permissible as to other German nationals seeking citizenship. Even Sittler's wife, a former dual national of Great Britain and Germany and once a member of a Hitler Youth group, has had her companion petition duly approved for the granting of citizenship when she presents herself for the purpose. The difference in treatment is pointed up by the case of Dr. Wernher Von Braun, the great rocket and missile engineer, now the trusted leader in our vast missile program, who came to this country in 1945 and was naturalized in 1950. His services to the Hitler regime in 1937–1945 in developing the long-range rocket and guided missile were of incalculable value, as history now tells us; but he has had the grace not to grovel or to attempt to cover up these activities, as he demonstrates in his authorized biography in Who's Who in America, vol. 32, 1962–1963, pp. 3233, 3234.

tributes his own dismissal from Shurtleff to his efforts in this regard.

Sittler secured temporary employment for the fall of 1956 in the local high school in East Alton, Illinois, substituting for the American history teacher who was ill. This job required a state certificate and Sittler was issued one. Part of his duties included preparing his classes for a state examination on the United States Constitution.

In February 1957 Sittler began teaching English, American, and world literature at Thiel College in Greenville, Pennsylvania. He and his wife were awarded fellowships by the Danforth Foundation, under an agreement with the administration of the college, which enabled the Sittlers to invite students to their home for regular group discussions of religious and moral problems. In addition, pursuant to the Danforth grants, the Sittlers studied history of art and religion at Drew University, Madison, New Jersey, during the summer of 1957, and literary criticism and religion at the University of Chicago during the summer of 1958. While Sittler was teaching at Thiel, his wife matriculated at Allegheny College in Meadville, Pennsylvania, where she majored in English and received a B.A.

During the academic year 1958–1959 Sittler was Associate Professor of German at Alfred University in Alfred, New York. That spring, his son entered the United States Army and his wife won a Woodrow Wilson Fellowship. Sittler secured work at C. W. Post College on Long Island, so that his wife could use her fellowship to study comparative literature at Columbia University.

The sole evidence for the government during the statutory period was a New York Post news item about Sittler's views on Hitler and the Hitler regime published in December 1959 and purportedly based on an interview with Sittler a month before. When called to testify about the incident, the reporter could only read his article into the record. Sittler testified that he had written the editor of the Post complaining of the inaccuracy of the story and testified further as to his own rather more complete recollections of the interview.

Over forty letters were written the naturalization examiner concerning Sittler's application for citizenship. Almost a third of the letters, in emotion-laden language, contended for the rule of law enunciated by the majority: that a former American citizen who became a citizen of Nazi Germany should be forever barred from again becoming an American citizen. But it is worth noting that not one letter opposing Sittler's application alleges that its writer has the slightest acquaintance with the petitioner; in fact, many disavow personal knowledge and quite a few come from groups such as Veterans of Foreign Wars posts, National Jewish Civil Service Employees, Inc., etc. These letters are the apparent result of unusually extensive publicity. See, e. g., "Pursued by the Past," Newsweek, Dec. 28, 1959, pp. 41–42. On the contrary, every letter supporting the application comes from a personal acquaintance of Sittler.

Six character witnesses of post-war acquaintance testified in Sittler's behalf —three students, a friend, a colleague, and an attorney with the United States Department of Justice. One girl had studied American literature with Dr. Sittler at Thiel College before she transferred to Barnard (where she was elected to Phi Beta Kappa), and a young man had been taught German by the petitioner at C. W. Post College. Both testified that Sittler would make a better citizen than most Americans. Another former student of Sittler's at Thiel, who had since become a staff writer for the National Lutheran Council, and a friend, who had known the Sittlers in Alfred, New York, testified in most certain terms that petitioner would make a loyal citizen, well disposed toward the good order of the United States and attached to its principles.

Another character witness was the renowned political scientist Professor Kenneth Colegrove. Long associated with Northwestern University, Professor

Colegrove, though retired, continued to do some teaching at C. W. Post. The professor recalled the faculty meeting at Northwestern where a handful of faculty members carried on a "bitter debate" to effect their "intense desire" to deny Sittler the degree to which he was entitled. Professor Colegrove had become well acquainted with Sittler more recently by sharing a car ride with him from Manhattan to the C. W. Post campus on Long Island and back again three times a week. Based on conversations during these rides, Professor Colegrove came to assess Sittler as "a man who was completely devoted to the United States, completely devoted to the high ideals of teaching, * * * the type of man that you'd like to have teach your young boy or your young girl who is going to college." Professor Colegrove told of the dismay with which he learned that Dean Hoxie, a former student of his, had given in to the pressures to discharge Sittler because of petitioner's background.

Sittler's final character witness was Victor C. Woerheide, long attorney with the Internal Security Division of the Department of Justice, prosecutor in a number of treason trials in which Sittler was the star government witness, and acquaintance and friend of Sittler since the war. His twenty years of activity in the important post he has occupied have made him concededly an expert in the Internal Security field; and his personal knowledge of the case, coupled with his disinterested position, made him perhaps the most competent and reliable of all the witnesses, and his testimony the most important in the proceedings. It is instructive to note the treatment it has received. The Hearing Examiner referred only to the witness' early testimony as to "the treasonable conduct of the petitioner during World War II," leaving out the testimony as to later conduct stressed by the witness; thus the Examiner's report gives a completely distorted view of this evidence. The trial judge made the briefest of references to it, 197 F.Supp. at page 283, which, while not affirmatively inaccurate, failed to do justice to its impact. And finally my brothers attempt a complete denigration of this witness which is quite unintelligible to me.

For they say that by eliminating far the largest portion of the testimony relating to what are emotively described as "Sittler's friends, the traitors Burgman, Chandler and Monty" (against whom Sittler had testified years earlier), the bulk of his testimony was directed to the proposition that Sittler was an unimportant cog in the Nazi machine and that his otherwise treasonable conduct did not reflect upon his moral character because of his taking German citizenship. Doubtless the witness did testify to relatively unimportant details, due to his evident desire and that of his examiner to show his full knowledge of all the petitioner's former Nazi activities and connections; and these were accentuated by a lengthy cross-examination longer than the direct examination. But it is difficult to see why this should justify total disregard of the basic features of his evidence, namely, his affirmative statements in regard to Sittler's good character and potentiality as an American citizen. Here his testimony was clear, strong, and believable. I shall close with a single quotation, out of the many available in the testimony, given in response to a question asking an appraisal of Sittler today and in the light of their post-war acquaintanceship. Mr. Woerheide responded:

"* * * I have no doubt in my own mind that if Edward Sittler is accorded the privilege of American citizenship, that he will be a loyal and law abiding citizen. He is not a conformist. He is a man who does think for himself. I wouldn't say that his ideas will fall into a regular idea pattern, the ideas that, let's say, a group of citizens in the United States, patriotic group of citizens in the United States, may have, but they will be, his ideas will be based on a sincere appreciation of the, of the merits and the qualities of our constitutional system of government in the United States."